## Case No. 16,427.

### UNITED STATES v. SWETT et al.

[2 Hask. 310.] [1]

District Court, D. Maine. Feb., 1879.

CRIMINAL JURISDICTION OF FEDERAL COURTS—CONSPIRACY—MISCONDUCT OF JUROR—BURDEN OF PROOF.

1. The federal courts have jurisdiction only of crimes and offenses created by acts of congress and when conferred by statutes of the United States.

2. An indictment, charging a conspiracy to have a bankrupt account for his property by falsely pretending that he had given a valid mortgage thereon to secure a consideration, a part of which he should falsely pretend to have been stolen, sets out an offense under section 5440, Rev. St., as a conspiracy to attempt to account for property by fictitious losses.

3. The burden rests upon the party charging misconduct of a juror during a trial to prove it.

4. A verdict will not be set aside when a juror who joined in it had during the trial indiscreetly made a remark out of court showing no bias, but only what impression he had received from the evidence.

Indictment for conspiracy under section 5440, Rev. St., to attempt to account for the property of a bankrupt by fictitious losses.

Both defendants [George W. Swett and John O. Winship] were found guilty upon the sixth count, and thereupon they moved that judgment be arrested, in that the count upon which they were convicted did not charge any offence enacted by act of congress, and for a new trial by reason of the misconduct of a juror.

Wilber F. Lunt, U. S. Dist. Atty.

Charles E. Clifford, for Swett.

Bion Bradbury and Charles F. Libby, for Winship.

[1] [Reported by Thomas Hawes Haskell. Esq., and here reprinted by permission.]

FOX, District Judge. The jury having found the defendants guilty upon the sixth count in this indictment, they have filed a motion in arrest of judgment thereon.

The federal courts have not jurisdiction to punish offences against the United States, which have not been previously defined and a specific punishment affixed by some statute of the United States. The crime must be so declared by act of congress and jurisdiction conferred on the court, and such statutes should not be extended, by judicial construction, to cases not clearly and unmistakably within the provisions of the act. Interpreting the averments found in the sixth count as they would be ordinarily understood, giving the language of the count its usual, customary meaning, are these defendants thereby charged with any offence against the United States?

This count, after setting forth that one Thomas A. Holland, July 26, 1876, was a person, respecting whom proceedings in bankruptcy had been commenced, alleges that Holland, with Swett, Winship and one William H. Leavitt, on July 26th, conspired to commit an offence against the United States, to wit: that Holland, on August 25th, in said proceedings in bankruptcy in the district court of the United States for the district of Maine, should then and there attempt to account for his property by fictitious losses and expenses, to wit, by then and there pretending that he, the said Holland, had on the 3d day of July, 1876, received from Swett and Leavitt the sum of $6000 as part of the consideration of two promissory notes for the sum of $5000 each, for which a mortgage was given by Holland to Swett and Leavitt to secure the payment thereof to them, which mortgage bill of sale contained certain of his, said Holland's, goods and chattels, viz: certain wool and shoddy stock of the value of $13,000, which mortgage bill of sale bore date as of May 4, 1876, and was then and there made by Holland and delivered to Swett and Leavitt, the consideration therein alleged being the sum of $10,000; and also, that he, said Holland, in said proceedings in bankruptcy in said district court, at said Portland, should testify and pretend, that said $6000 had been feloniously stolen from him said Holland, in Boston, July 4, 1876, with intent to defraud Perkins & als., creditors of said Holland. [See Case No. 6,603.] It avers, that the $6000 was not paid to Holland and was never stolen from him, all of which the defendants well knew; and that Holland in pursuance of this conspiracy and to effect the object thereof, on August 26th, did attempt to account for his property by fictitious losses, by falsely testifying and pretending that said $6000 was so paid to him by Swett and Leavitt as a part of the consideration of the notes purporting to be secured by said mortgage, and that the same was so stolen from him.

Rev. St. U. S. § 5440, declares that if two or more persons conspire, either to commit an offence against the United States, or

* * * , and one of such persons does any act to effect the object of the conspiracy, all the parties shall be liable, &c. The offence against the United States, which these defendants are charged with having conspired to commit, is set forth in section 5132, which enacts that every person against whom proceedings in bankruptcy are commenced, who attempts to account for his property by fictitious losses or expenses shall be punished.

The principal objection to the sixth count is, that the allegations therein contained do not set forth and describe the offence contemplated by section 5132; and in the language of the brief, "the count is fatally defective in this, that it does not allege that Holland was the owner or possessor of any property for which he attempted to account by fictitious losses, or that he attempted to account for any property which was ever in existence; that the indictment is guilty of the absurdity of charging that a man can be guilty of keeping his property from his assignee by pretending to have and lose what he never had at all."

The contention is, that, as the count states he never had the $6000, he, as a matter of course, could never have lost it; that there could never be a fictitious loss of this property, and that he could not, under such circumstances, be guilty of the offence of attempting to account for his property by fictitious losses. If, to constitute the offence, it is necessary that the property which the bankrupt claims to have lost, he should at some time have actually owned, and if the only allegations in the count had been, that not being the owner of the $6000, he was to pretend he had lost the same, it may possibly be that this objection would have been valid, and that one material averment in the count would have been so repugnant to others that the count would be bad. For reasons hereinafter given, it is not necessary for any definite ruling upon such an objection; but, as at present advised, the court is not without considerable doubt as to its validity.

While one can not actually lose that which never existed, or which he never possessed or owned, may it not be, that under the bankrupt law, when attempting to account for his property, he may affirm that he had certain property that had been stolen from him, when in fact he never had the property? The offence denounced by section 5132 is not the concealing by the bankrupt of his property from his assignee, but, it is an attempt to account for his property by fictitious losses.

What are the constituents of this crime under section 5132?

First there must be the attempt by the bankrupt to account for his property. Does this require that at some previous time he should actually have owned the property, or that he should assert his having been the owner, and thereupon, as his property, attempt to account for it? If he asserts that on a certain day he had such and such property, which he goes on and accounts for as lost, is it or not, within the law, an attempt by him to account for his property? Of what matter is it, whether he held an absolute or contingent title, or whether he had any interest in the property, provided he accounts for it as his, and asserts that it was his?

Secondly, the alleged loss must be fictitious; that is, there must not have been any loss. Certainly, this requirement is met as fully when there was no property to lose, as when it has actually been stolen from him. The purpose of the bankrupt, by such false statements, is to deceive and mislead his assignee, or the court; and by pursuing this course, and asserting that he once had the property, of which he had thus been deprived, he, for the time, succeeds in accomplishing his object. This objection has been presented by both of the learned counsel with much force, and while it is by no means free from doubt, my opinion is rather inclined to the conclusion that the offence designated would be committed by a bankrupt, if, in attempting to give an account of his property, he declares that a portion of his property consisted of certain articles which had been stolen from him, when in fact he never had such property.

The validity of this count is not dependent on the correctness of this construction of the law, as other material averments are therein contained, which entirely obviate the objection as here presented. The conspiracy therein charged is not simply that Holland, in the course of the proceedings in bankruptcy, should attempt by a fictitious loss to account for the six thousand dollars which he never had; but it is, that he, on the twenty-fifth day of August, at Portland, in said proceedings in bankruptcy, in the district court of the United States for said district of Maine, should then and there attempt to account for his property by fictitious losses and expenses, to wit: by then and there pretending that he had, on the third day of July, A. D. 1876, received from Swett and Leavitt, the sum of $6000 as part of the consideration of two promissory notes for the sum of $5000 each, for which a mortgage was given by said Holland on certain wool, &c., of the value of $13,000; and also, that in said proceedings in bankruptcy, said Holland should testify and pretend that said $6000 had been stolen in Boston on the fourth of July. The allegations here made are definite and specific, that the conspiracy was that Holland should attempt to account for his property by pretending that he had given Swett and Leavitt a valid mortgage for $10,000 on his wool and other property, valued at $13,000, and that he should also pretend that, in part of the consideration of the notes for $10,000 so secured upon the stock, he had received $6,000 which had been stolen from him. This conspiracy as set forth in this count covered the entire proceedings, not only the pretence that he received the $6,000 and it had been stolen, but that it also constituted a part of the consideration of the mortgage, giving validity to it in this respect, and that the wool

and other property in his possession was legally subject to this incumbrance. He was, therefore, thus to account for his property, his wool and shoddy, and to claim that he in good faith had given a valid mortgage upon it, a part of the consideration of which had been stolen from him.

In the language of Blumensteil: "The bankrupt was to attempt to explain the deficiency in his property, by giving false reasons therefor, and by enumerating alleged losses which had not occurred, an act which is not only fraudulent and opposed to that full disclosure which is essential to be made by every bankrupt, but also involves the crime of perjury."

It was agreed between the conspirators that Holland, when called upon in the bankrupt court to disclose about his property, its state, title and condition, should testify that he had been the owner of this specific property, the wool, &c., but that the same was encumbered by a valid mortgage for a loan received by him, and which had been stolen from him. This certainly was a conspiracy to account for this property, and, by so accounting, to explain how and why he was no longer its absolute owner, and, by pretence of a fictitious loss, to attempt to satisfy the court that he had received and lost a portion of the sum, as security for which he had encumbered it. In the opinion of the court, these averments in this count bring the case within both the letter and spirit of the act, as a conspiracy to attempt to account for his property by a fictitious loss.

There is also a motion to set aside the verdict for alleged misconduct of S. F. Piper, one of the jurors, on two occasions:

First: In conversing with one of the witnesses, in a room in this building in the basement adjoining the water closets, Leroy S. Sanborn testified: "I was a clerk in the post office and was in the water closet December eighteenth, when the trial was about half through. The door of the closet was partly open, so that I could see into the room. Heard a voice say, 'One is as guilty as the other.' Looked out the door and saw three men come in. One was Thomas Brackett, the other two I did not know. One had on a hat, the other did not. Heard the man without the hat say to Brackett, 'I saw you on the stand, didn't I?' Brackett replied, 'Yes, I was.' Then the man asked, 'Did you lose anything by Swett or Holland?' and Brackett replied, 'We did.' The man with the hat on said to Brackett, 'What kind of a fellow is Swett?' and Brackett replied, 'He is a tricky bugger, but people have a good deal of sympathy for him since he came out of the army.' The same man then says to Brackett, 'Holland is a pretty good fellow, ain't he?' I did not catch the reply. During the time these men were there, Tobias Eastman and Samuel Dingley came in. The man without the hat I after-

wards saw on the jury. Informed Winship of this conversation the day the verdict was rendered." On cross examination, witness stated: "I have known Winship as long as I can remember, went to school to him, have been on very friendly terms with him, expressed my sympathy for him during the trial and my hope of his acquittal. I knew Brackett. He shook his head to the inquiry about Holland being a pretty good fellow. I was twelve or fifteen feet from the men while they were talking."

Tobias Eastman testified: "I was in the room where the water closets are the day after Brackett testified. Recognized Brackett there and two of the jurymen. Could not say whether they were talking together and did not pay any attention."

Isaac D. Waterman testified: "I was one of the jury, and went with Piper to the water closets and was near him all the time he was there. Don't think I heard any conversation between Brackett and Piper. Heard some talk; something about slapping in the face. Piper made no conversation with Brackett that I know of. I did not hear all the talk; within my hearing Piper made no conversation with Brackett."

Samuel F. Piper testified: "I was one of the jurors. Went to water closet with Waterman. Asked a gentleman who resided in Gorham or Windham what kind of a man Swett was. He said people out there had a good deal of sympathy for him, and that was all that was said by him; nothing else said by Brackett. I asked the question because I had seen a man on crutches at White Rock yearly meeting and thought it might have been Swett. I did not inquire about Holland, as I knew him when he lived in Limerick. The man did not say that Swett was a tricky bugger. I have stated all that I heard said. Waterman was about two feet from me at the time of this conversation."

Thomas Brackett testified: "I do not think I had any conversation with Piper; did not know the man till to-day. I answer positively that I never said Swett was a tricky bugger—never said any such thing."

To authorize the court to set aside a verdict for misconduct of the jury, such misconduct must be satisfactorily established, the burden being upon the moving party. Sanborn's testimony certainly tends to show that one of the witnesses, in conversation with one of the jurymen during the trial, made statements prejudicial to the character of Swett, and calculated to impair the confidence of the juror in him as a witness. Such statements should appear to have been made in the hearing of the jury to affect the verdict. Sanborn was apparently a fair, candid and intelligent witness, and the only reason for questioning the correctness of his statement is his sympathy for Winship and the friendly relations between them.

Brackett positively denies that he used the

expression attributed to him by Sanborn. Piper admits he conversed with Brackett, and that Brackett remarked, "people out there had a good deal of sympathy for Swett;" but he swears "Brackett did not say Swett was a tricky bugger." Waterman did not hear any conversation between Piper and Brackett, although they went together to the water closet and were near each other; and Eastman, called by defendants, says the jurymen were there with Brackett, but could not tell whether they were talking together. Two witnesses, therefore, are found contradicting the statement of Sanborn, and testifying that Brackett did not use this language, and the court, having seen Piper upon the stand as a witness, does not feel justified in believing him to have been guilty of wilful falsehood, although he certainly deserves reprehension for conversing with any one about the case while on trial, against the urgent injunction of the court. If such language was used by Brackett, it certainly did not attract the attention of any one but Sanborn, as it was not heard by either Piper, Waterman, or Eastman, as they testify; and the defendants, therefore, could not have been prejudiced by any remarks of which the jury were not cognizant, although made in their presence.

Secondly: It is also alleged that Piper conversed with Edwin L. Dyer while travelling on the cars of the Grand Trunk Railroad on Saturday afternoon, the case for the government having been in progress some four or five days. Dyer is an attorney at law, quite lately admitted to the bar, and formerly a student in the office of Drummond and Winship. His testimony is, "I took a seat alongside of Piper knowing he was a juror, and entered into conversation with him. Piper said, they had a pretty interesting case; it was a long job. I replied 'Yes.' Piper then said he thought there was a good deal of rascality there, and that Winship knew something about it, and he should receive no mercy at his hands. Told him he ought to be careful what he said. Did not inform Winship of this till day before yesterday."

Piper admits he had a conversation with Dyer in the cars, but denies that he said Winship should have no mercy at his hands, and insists that it was Dyer who called Winship the rascal. With this conflict between the witnesses, and with the burden on defendants, the court is not satisfied that Piper did use the language attributed to him by Dyer; if he had, it would not afford sufficient cause for a new trial.

Such remarks do not indicate that there was any bias or prejudice in the mind of the juror previous to the trial, but only disclose the impression he was then under, caused by the testimony he had heard. At the time of this interview, the testimony of the witnesses in behalf of the government, if they were believed by the jury, established the guilt of these defendants. Unintentionally the minds of jurors, as they listen to the evidence, do receive impressions more or less positive, but they frequently are effaced as the cause progresses. Experience teaches that few persons can keep their minds unbiased when hearing a strong one-sided statement.

No case has been found which would authorise the court to set aside a verdict for such conduct on the part of a juror; but on the contrary, in Harrison v. Price, 22 Ind. 168, the court refused so to do where it appeared that, during the time of hearing the evidence, a juror, while at dinner, asked a stranger how he thought the case would go, to which the reply was, "from outside rumor the jury ought to find for defendant; but from the appearance of the jury, he thought it would find for plaintiff," to which the juror made answer, " 'Yes, by God, I know it will.' " The court, in refusing the motion said, "The juror could not help the involuntary action of his own mind; but he indiscreetly uttered the remark before the trial was completed.

Motion in arrest, and for a new trial, overruled.

In conclusion, Judge FOX said that, at the suggestion of the defendants' counsel, he had consulted with Judge LOWELL of the circuit court, and that he was authorized to say that Judge LOWELL, after a careful examination of the written opinion, concurred in the decision.

At a later day the defendants being set at the bar, and sentence being moved for, the court said:

FOX, District Judge. George W. Swett and John O. Winship, the court cannot but regret that it is now obliged to pronounce that sentence which the law requires me to award against you for the very serious crime of which you have been found guilty.

You, Swett, in defence of your country, became maimed and crippled for life; but your friends and neighbors had such confidence and sympathy for you, on your return home, that you were appointed postmaster, and have accumulated a little property, all of which; it is said, has been lost in attempting to aid an associate in a most bold and wicked attempt to defraud his creditors. You joined in this conspiracy to transfer to you and your confederate, by various false and fraudulent conveyances, property of the debtor of great value; and, as difficulties gathered around the transaction, in accomplishing your fraudulent purposes and deceiving the creditors, you at last, under the sanction of a solemn oath, asseverated the truthfulness of your statements and the fairness and honesty of your dealings with the debtor in your examination before the register in bankruptcy. You swore to many state-

ments which you then knew were false; and that you might be successful in your fraud, you committed wilful, corrupt perjury.

Your associates, by their oaths, corroborated the truthfulness of your statements, so that these persons, who had heretofore been of fair reputation in this county, by concert and express agreement between them, each swore to wilful falsehood, and subjected themselves to the disgrace and shame and penalties of the crime of perjury.

The other prisoner, John O. Winship, has for some years been an attorney of this court, of more than ordinary endowments and ability, and was associated for some time with a gentleman of the highest standing and character, who was in no way cognizant of Winship's misconduct, and whom the court, with the greatest satisfaction, thus publicly exonerates from any imputation by reason of his relations with Winship.

The evidence tended to show that the other conspirators employed Winship as their attorney to draft for them, from time to time, these fraudulent conveyances, four in number; but the jury were not satisfied that Winship actually joined and participated in the conspiracy with the others prior to the fictitious mortgage by Holland of his wool and other stock for $10,000 to Swett and Leavitt; but, by their verdict, they do find that, after that, Winship did conspire with the others that it should be pretended that Swett and Leavitt had paid the $6000 to Holland as part of the consideration of this mortgage, and that Holland should pretend to have lost this sum, and should afterwards so testify in the proceedings in bankruptcy. At the time you joined in this conspiracy, you, Winship, well knew that this amount was never so loaned to Holland, and was never lost by him; and yet, you attended as the counsel for all the other conspirators before the register in bankruptcy in their examination under oath, and you provided Holland with a copy of his false testimony, in relation to this matter, as given by him before the district judge on a prior occasion, in order that there should be no conflict in his statement. You listened to this false testimony, of these your fellow conspirators, given in accordance with the agreement between you, and which you and they knew was false; and you thereby sanctioned and promoted this wicked fraud, thus sustained by the wholesale perjury of all of them. The pretence that your relation of counsel to these parties justified your conduct is so monstrous, that the simple statement affords its complete refutal. Conspiracy and subornation of perjury have not become a part of the duty incumbent upon an attorney in behalf of his client. Such conduct can only be denounced as a most base and detestable crime, especially on the part of an attorney, in whom the court has imposed confidence as one of its officers. Such crimes deserve and will receive condign and vigorous punishment, that others, who may be exposed to like temptations, may profit by this before and be delivered from committing the offence.

For this crime, the statute declares that the punishment shall be by fine of not less than $1000, nor more than $10,000, and imprisonment not exceeding two years.

The court has entertained serious doubt whether it would be justified in not requiring the imprisonment to be in the state prison; but, considering that this is the first conviction under this statute in this district, and that it will be understood that if others should be hereafter convicted of similar offences, the punishment, in all probability, will be to the full extent allowed by the law, I have concluded to impose upon each of you an imprisonment in jail, as being less odious and disgraceful, and not so likely hereafter to prove prejudicial to you, if by your future conduct you shall manifest sincere repentance for your crime. The term of imprisonment will be for as short a duration as I have imposed in another district upon parties convicted of offences under this section of the statute.

Fine $1000 each, one year imprisonment in jail, Portland.

NOTE. Both defendants were committed in execution of their sentence Feb. 8, 1879, and both were pardoned by President Hayes. They were released by virtue of the pardon; Winship, June 25; 1879, and Swett, Jan. 12, 1880.